IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAED AL-KHADER,<br><br>     PLAINTIFF,<br><br>  v.<br><br>SERFILCO, LTD.<br><br>     DEFENDANTS. | Case No. 08 C 955<br><br>Hon. Judge Nordberg |

## AMENDED COMPLAINT

NOW COMES the Plaintiff, RAED AL-KHADER, by and through undersigned counsel, and submits his Amended Complaint on Defendant SERFILCO, LTD. as follows:

## INTRODUCTION

1. Plaintiff RAED AL-KHADER ("Mr. Al-Khader") seeks redress for religion, national origin, and ancestry discrimination, harassment, and retaliation. This case is brought for relief pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended, and pursuant to 42 U.S.C. § 1981, as amended.

## PARTIES

2. Plaintiff Mr. Al-Khader is a Muslim male of Middle-Eastern origin and Arab ancestry. He presently resides at 1625 Elmwood Drive, in the City of Highland Park, County of Lake, State of Illinois.

3. Defendant SERFILCO, LTD. (hereinafter "Serfilco") is an entity of Cook County doing business at, and maintaining its principal office at, 2900 MacArthur Blvd. in the City of Northbrook, County of Cook, State of Illinois.

4. Defendant employs 15 or more employees for each working day for 20 or more calendar weeks in the current or preceding calendar year.

## JURISDICTION AND VENUE

5. This Court has jurisdiction of this case pursuant to 42 U.S.C. §§ 2000e *et seq.*, and 28 U.S.C. §§ 1331 and 1343.

6. This action properly lies in this district pursuant to 28 U.S.C. § 1391 because Defendants reside in this district and/or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

7. On or about October 26, 2007, Plaintiff contacted the EEOC national call center. This call was placed within the 300 day statute of limitations for filing a complaint of discrimination with the EEOC.

8. Plaintiff provided details to the operator about his complaint including that he was told of his termination on January 3, 2007 but was paid until January 5, 2007. Plaintiff believed that by speaking to the operator he was filing a complaint and preserving the statute of limitations.

9. The EEOC operator tried to connect Plaintiff to the Chicago EEOC office but was unsuccessful. The operator told Plaintiff was told by the operator that within 48 hours a representative from the Chicago EEOC would contact him.

10. On or about October 29, 2007, Plaintiff was contacted by the Chicago EEOC office. This call was a day beyond the 48 hour time frame the EEOC had given Plaintiff.

11. Plaintiff did not go through an intake with the EEOC representative from Chicago. Plaintiff believed that the initial operator he had spoke to had passed along his information to the Chicago EEOC representative and was Chicago aware that the statute of limitations would run out by October 31, 2007 however Plaintiff believed he had satisfied his burden on October 26, 2007 when he made his initial complaint.

12. Plaintiff was told to attend an interview with the EEOC on November 1, 2007, which was 300 days after his last day of pay but 302 days after he received notice of termination. This error was made on the part of the EEOC not the Plaintiff.

13. On or about November 1, 2007, Plaintiff attended his appointment with the EEOC and filed a Charge of Discrimination (Charge Number 440-2008-00649), based on national origin and religion, with the Equal Employment Opportunity Commission ("EEOC"). A copy of the Charge of Discrimination is attached hereto as Exhibit A.

14. Plaintiff was informed that he had filed his charge two days after the statutory deadline but would be issued a Notice of Right to Sue. A copy of the Notice of Right to Sue is attached hereto as Exhibit B.

15. On or about November 16, 2007, Plaintiff received his Notice of Right to Sue from the EEOC for Charge 440-2008-00649.

## COMMON ALLEGATIONS

16. Mr. Al-Khader is a Muslim male of Arab ancestry and Middle-Eastern origin.

17. In March 1995, Mr. Al-Khader was hired by Serfilco, a business that manufactures liquid handling equipment, as a designer in its engineering department. He left Serfilco in September 1995 to pursue another work opportunity.

18. In October 1997, Mr. Al-Khader was rehired by Serfilco as a designer in Serfilco's engineering department. This position involved designing products for Serfilco and reviewing and improving upon Serfilco's product line.

19. While employed by Serfilco, Mr. Al-Khader performed his work satisfactorily and met Serfilco's expectations. On his annual written evaluations, he received ratings of 4 ("excellent") and 5 ("exceptional") on a 5-point scale.

20. While employed by Serfilco, Mr. Al-Khader was constantly harassed by his co-worker Greg Karlove, the department's IT manager, who directed racist remarks toward Mr. Al-Khader in public, while Mr. Al-Khader's other co-workers were present. Karlove repeatedly told him to "go back to [his] country."

21. Mr. Al-Khader complained to his supervisor, Mark Glodoski, about these remarks on several occasions, and Glodoski attempted to resolve the situation by having Karlove apologize to Mr. Al-Khader. Although his discriminatory remarks were always made in front of Mr. Al-Khader's co-workers, Karlove apologized to Mr. Al-Khader in private.

22. Sometime in 2001, Glodoski resigned from his position, and Stephen Wu became Mr. Al-Khader's new supervisor.

23. In the fall of 2001, sometime after Wu became his supervisor, Mr. Al-Khader found a stack of papers in Serfilco's cafeteria that referred to Arabs as "terrorists," "rag heads," and "camel jockeys." Mr. Al-Khader took a copy to show to Jim Berg, who is one of Serfilco's owners and holds a management position with the company. Mr. Al-Khader told Berg that he found the papers very offensive; however, Berg simply stated that he did not "condone that" and walked away. No further action was taken on the matter. In addition, Karlove, who also saw the papers, told Mr. Al-Khader not to "rock the boat."

24. On another occasion in 2006, employees in Serfilco's IT department played a video of the beheading of an American in Iraq, turning the volume up loud so that employees in the engineering department could hear the video. While the video was playing, Eric, a co-worker in the IT department, came and looked at Mr. Al-Khader, apparently waiting for a reaction from him.

25. On several other occasions, the shop foreman at Serfilco, Ted Kopacz, made a Hitler salute at Mr. Al-Khader.

26. On at least a few occasions, a department manager at Serfilco, Larry Black, called Mr. Al-Khader a "camel jockey."

27. On or about October 2006, Lillian Hutchins, the President's Secretary at Serfilco, directed discriminatory remarks towards Mr. Al-Khader, telling him that he should shave his beard and that he looked "like a terrorist." Another co-worker, Benjamin Leyva, also told Mr. Al-Khader that he looked like a terrorist.

28. On or about October 2006, Karlove questioned Mr. Al-Khader regarding the Hamas group in the Middle East and why they were fighting the state of Israel. When Mr. Al-Khader attempted to explain the situation between Israel and the Palestinians, Karlove told Mr. Al-Khader that he hoped Israel would "nuke all of you." Wu was present and heard Karlove's statement.

29. Mr. Al-Khader complained about Karlove's discriminatory remarks to Wu several times. Wu informed Mr. Al-Khader that Karlove was "harmless" and "like Archie Bunker" and did not attempt to resolve the situation. Even when Wu personally witnessed Karlove's discriminatory remarks, as above, he took no action to reprimand Karlove.

30. In addition, Mr. Al-Khader noticed that everyone else with whom he shared a workroom, including the other designer, had internet access on their personal computers, while he did not. Internet access was necessary to carry out Mr. Al-Khader's job, which required researching parts online and communicating with vendors.

31. Furthermore, because he did not have regular email access, Mr. Al-Khader did not receive advance notice of trainings and seminars and was thus often unable to make arrangements to attend. Other employees, who received advance notice through emails, were able to attend these trainings.

32. When Mr. Al-Khader asked Karlove, who was the IT manager, for internet access on his own computer, Karlove responded, laughing, "So you can write Osama bin Laden?"

33. On several occasions, Mr. Al-Khader spoke to Wu about not having internet access on his computer, and Wu told Mr. Al-Khader that Karlove, as IT manager, had control over the matter. Finally, in summer 2006, Mr. Al-Khader suggested to Wu that he, as supervisor, should have control over the matter. Wu then asked Mr. Al-Khader, "Do you like working here?" and stated that Mr. Al-Khader did not need internet access on his computer.

34. Mr. Al-Khader also noticed at this time that, although he submitted his projects by their deadlines, Wu postponed reviewing these projects and did not check them off as completed until he had approved them. When Mr. Al-Khader checked the status of his projects, they appeared as "overdue."

35. In August 2006, Mr. Al-Khader received a written evaluation of his work that was less positive than the evaluations he had received in the past. However, the evaluation still indicated that Mr. Al-Khader had achieved job requirements and did not contain any assertions that Mr. Al-Khader was not meeting Serfilco's expectations.

36. On or about early September 2006, Mr. Al-Khader met with Serfilco's human resources manager, Sue Vollmer, to discuss the annual review and the unequal treatment he faced. At this time, because he feared negative consequences, he did not state his belief that the unequal treatment was due to discrimination against his national origin and/or religion, nor did he complain about his co-workers' racist remarks. Vollmer asked Mr. Al-Khader to put his complaint in writing.

37. In September 2006, Mr. Al-Khader filed a written complaint with Sue Vollmer but, because he feared negative consequences, did not state his belief that the

7

treatment was due to discrimination or include his co-workers' discriminatory remarks in the complaint.

38. On or about October 18, 2006, Mr. Al-Khader asked Vollmer to deliver to Wu a letter he had written outlining his main concerns: lack of access to the internet as well as to software programs that he had previously used in his work but were no longer installed on his computer. In this letter, Mr. Al-Khader explained why internet access and these software programs were necessary for his work.

39. On or about October 24, 2006, Wu responded to Mr. Al-Khader's letter but did not fully resolve the issues Mr. Al-Khader raised. Rather than provide Mr. Al-Khader with internet access on his own computer, Wu stated that a common computer with internet access would be provided for his use.

40. On or about late October 2006 or early November 2006, Mr. Al-Khader met with Vollmer for a second time. At this time, he stated his belief that he was being discriminated against due to his national origin and religion. In addition, Mr. Al-Khader told Vollmer that several co-workers, throughout the years, had made numerous insensitive and racist remarks and that Wu had dismissed these remarks as "harmless." Mr. Al-Khader told Vollmer that he had not brought this up before because he did not want to make it into a big problem, but that it was affecting his work. Mr. Al-Khader asked Vollmer not to directly confront any of his co-workers and stated that he would instead prefer that Serfilco hold a sensitivity training for its employees or distribute a memorandum regarding appropriate work behavior.

41. Following Mr. Al-Khader's second meeting with Vollmer, Vollmer scheduled a meeting between Mr. Al-Khader, Wu, and Wu's manager that was to take place on January 4, 2007. Mr. Al-Khader noticed that Wu was treating him coldly. He therefore believes that Vollmer communicated his statements regarding discrimination to Wu.

42. On or about January 3, 2007, Mr. Al-Khader was called into a meeting with Vollmer and Wu. Wu informed Mr. Al-Khader that "the position" was being eliminated and that he was therefore terminated. Mr. Al-Khader asked if his co-worker Tomasz Rebidasz, who held the same designer position and who was on vacation at the time, was terminated as well. Wu and Vollmer stated that Rebidasz was also terminated and would be notified over the phone.

43. Upon information and belief, however, Rebidasz, who is neither Arab nor Muslim, returned to work at Serfilco after his vacation and remained employed in the same position.

44. Mr. Al-Khader was at least as, if not more, qualified as Rebidasz. Mr. Al-Khader had seniority over Rebidasz at Serfilco. Like Rebidasz, Mr. Al-Khader had earned an associates degree in Mechanical Design. Moreover, Mr. Al-Khader possessed technical and computer skills that Rebidasz did not have, such as experience with sheet metal work, as well as experience with software programs such as Adobe Photoshop and Microsoft Visio. Despite this, Rebidasz retained his job while Mr. Al-Khader did not.

## **COUNT I**

### (Title VII – Race, Color, Religion, and National Origin Discrimination and Harassment, and Retaliation

45. Paragraphs 1-37 are restated herein.

46. Defendant intentionally discriminated against Mr. Al-Khader by creating an intimidating, hostile and offensive work environment for Mr. Al-Khader and illegally terminating Mr. Al-Khader in violation of 42 U.S.C. § 2000e *et seq.*, as amended.

47. Defendant retaliated against Mr. Al-Khader for complaining of discrimination or harassment, in violation of 42 U.S.C. § 2000e, *et seq.*, as amended.

48. Defendants' unlawful actions have caused Mr. Al-Khader emotional distress, inconvenience, lost wages and benefits, and other consequential damages.

WHEREFORE Mr. Al-Khader respectfully requests:

a. All wages and benefits he would have received but for the discrimination and retaliation;

b. Compensatory damages;

c. Punitive damages;

d. Attorney's fees and costs; and

e. Such other relief as law and justice allow.

### COUNT II
### (Section 1981 – Race and Ancestry Discrimination and Retaliation)

49. Paragraphs 1-40 are restated herein.

50. Defendant intentionally discriminated against Plaintiff on the basis of race and ancestry in violation of 42 U.S.C. § 1981, as amended.

51. Defendant, in violation of 42 U.S.C. § 1981, as amended, retaliated against Plaintiff for complaining of discrimination on the basis of race and ancestry.

52. Defendant's unlawful actions have caused Plaintiff emotional distress, inconvenience, lost wages and benefits, and other consequential damages.

WHEREFORE Plaintiff respectfully requests:

   a. All wages and benefits he would have received but for the discrimination and retaliation;

   b. A position with Defendant with seniority or, in the alternative, front pay;

   c. Compensatory damages;

   d. Punitive damages;

   e. Attorney's fees and costs; and

   f. Such other relief as law and justice allow.

## JURY TRIAL

53. Plaintiff demands that the case be tried by a jury.

By: _____
Attorney for Plaintiff

Patricia Kemling
Council on American-Islamic Relations-Chicago
28 East Jackson Boulevard, Suite 1410
Chicago, IL 60604
Attorney # 6286541
Tel: 312-212-1520
Fax: 312-212-1530
E-mail: rima@cairchicago.org